*Arr # 1:18mj379*

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

F I L E D

AUG - 2 2018

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VA

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. **18-MJ-1290** |
| SETH C. JACOBS, | ) | |
| D.O.B. xx/xx/1990 | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant* | | |

## ARREST WARRANT

To:   Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*   SETH C. JACOBS                                                      ,

who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment   ☐ Superseding Indictment   ☐ Information   ☐ Superseding Information   ☑ Complaint

☐ Probation Violation Petition   ☐ Supervised Release Violation Petition   ☐ Violation Notice   ☐ Order of the Court

This offense is briefly described as follows:

Title 21, U.S.C., Sections 841(a)(1), 841(b)(1)(B), and 846, Conspiracy to Possess with Intent to Distribute and to Distribute in excess of 100 kilograms of Marijuana, a Schedule I Controlled Substance; and, Title 18, U.S.C., Sections 1956 and 2, Money Laundering, and Conspiracy to commit Money Laundering.

Date:   7/19/18                                   *[signature]*
                                                    *Issuing officer's signature*

City and state:   Milwaukee, WI                   William E. Duffin, U.S. Magistrate Judge
                                                    *Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* 7-19-18 , and the person was arrested on *(date)* 8-2-2018 at *(city and state)* Alexandria, VA . |
| Date:   8-2- 2018                         *[signature]* |
|                                            *Arresting officer's signature* |
|                                            SA Beau Bilek |
|                                            *Printed name and title* |

AO 442 (Rev. 11/11) Arrest Warrant

U.S. District Court
Eastern District of Wis.
I hereby certify that this is a
true and correct copy of the
original now remaining of record
in office.
WILLIAM E. DUFFIN
U.S. Magistrate Judge
DATED:       7/19
By: CLERK

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No.   18·MJ-1290 |
| SETH C. JACOBS, | ) | |
| D.O.B. xx/xx/1990 | ) | |
| | ) | |
| | ) | |
| *Defendant* | | |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*     SETH C. JACOBS                                            ,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment          ☐ Superseding Indictment          ☐ Information          ☐ Superseding Information          ☑ Complaint

☐ Probation Violation Petition          ☐ Supervised Release Violation Petition          ☐ Violation Notice          ☐ Order of the Court

This offense is briefly described as follows:

Title 21, U.S.C., Sections 841(a)(1), 841(b)(1)(B), and 846, Conspiracy to Possess with Intent to Distribute and to
Distribute in excess of 100 kilograms of Marijuana, a Schedule I Controlled Substance; and, Title 18, U.S.C., Sections
1956 and 2, Money Laundering, and Conspiracy to commit Money Laundering.

Date:     7/19/18

_____
*Issuing officer's signature*

City and state:     Milwaukee, WI

William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____     _____ <br> *Arresting officer's signature* <br><br> _____ <br> *Printed name and title* |

# United States District Court

## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA

v.

ROBERT K. MALKIN, xx/xx/1956,
SETH C. JACOBS xx/xx/1990,
LEV B. REYS xx/xx/1983,
JASON J. MALKIN xx/xx/1987,
MOHAMMED E. OMAR xx/xx/1993,
ALAE ARBI xx/xx/1990,
NAHOM HAGOS xx/xx/1989,
SCOTT A. JUNGWIRTH, xx/xx/1960
FREDRIC H. BIRAULT xx/xx/1932, and
LACHELLE COOK xx/xx/1987,

**CRIMINAL COMPLAINT**
CASE NUMBER: 18· MJ- 1290

U.S. District Court
Eastern District of Wis.
I hereby certify that this is a
true and correct copy of the
original now remaining of record
in my office.
WILLIAM E. DUFFIN
U.S. Magistrate Judge
DATED:
By: CLERK

I, Richard Connors, the complainant in this case, state that the following is true to the best of my knowledge and belief.   On or about the dates of January 2015 through the present in the County of Milwaukee, in the Eastern District of Wisconsin, and elsewhere the defendants Robert K. Malkin, Seth C. Jacobs, Lev B. Reys, Jason J. Malkin, Mohammed E. Omar, Alae Arbi, Nahom Hagos, Scott A. Jungwirth, and Fredric Birault, violated:

Title 21, U.S.C., Sections 841(a)(1), 841(b)(1)(B), and 846, Conspiracy to Possess with Intent to Distribute and to Distribute in excess of 100 kilograms of Marijuana, a Schedule I Controlled Substance; and, Title 18, U.S.C., Sections 1956 and 2, Money Laundering, and Conspiracy to commit Money Laundering.

Defendant Lachelle Cook violated Title 18, U.S.C., Sections 1956 and 2, Money Laundering, and Conspiracy to commit Money Laundering.

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

Continued on the attached sheet and made a part hereof:   __X__ Yes   ____ No

_____
Richard Connors, ATF Agent

Sworn to before me and subscribed in my presence,

Date: __7/19/18__

City and State: __Milwaukee, Wisconsin__

_____
The Honorable William E. Duffin
United States Magistrate Judge

## AFFIDAVIT IN SUPPORT OF CRIMINAL
## COMPLAINT AND SEARCH WARRANT

## I.    INTRODUCTION

I, Richard Connors, being duly sworn, depose and state as follows:

1.      I am employed as a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) assigned to the Milwaukee Field Office since October of 2015. I have been employed as a full time law enforcement officer for over 2 and a half years. I have received training at the Federal Law Enforcement Training Center in Glynco, GA. I attended the Criminal Investigator Training Program, as well as ATF's Special Agent Training Program. I have received training in the investigation of unlawful possession of firearms, the unlawful transfer of firearms, and the unlawful dealing in firearms without a dealers' license.  Before becoming a Special Agent with the ATF, I received two bachelor's degrees from Northern Illinois University in the fields of Sociology and International Relations. I have received a Master's degree from Northern Illinois University in the field of American Government.

2.      I have training and experience in investigating narcotics and firearms trafficking, As a law enforcement officer, I have authored many criminal complaints and search and seizure warrants, and I have participated in the execution of warrants, at which times narcotics, firearms, ammunition, records or receipts pertaining to such, and U.S. currency have been seized.  I have debriefed defendants, informants, and witnesses who had personal knowledge regarding narcotics trafficking organizations and firearms trafficking.  I am familiar with narcotics traffickers' methods of operation including the distribution, storage, importation, and transportation of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering.  Furthermore, I know large-scale drug traffickers use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency

1

counting machines, and telephone answering machines to generate, transfer, count, record and/or store information related to their drug trafficking, as well as to conduct drug trafficking activities.

3.    I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by the law to conduct investigations of and to make arrests for the offenses enumerated in Title 18, United States Code, Section 2516.

4.    The facts in this affidavit come from my training and experience as well as my personal participation in this investigation via (a) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, all of whom I believe to be truthful and reliable; and (b) information obtained from cooperating citizen witnesses, confidential sources, and defendants.

5.    Through training, experience, and discussions with other experienced agents:

a.    I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

b.    I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, and crack cocaine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

c.    I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

d.    I know drug dealers often put telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

e.    I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though

2

these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

f.   I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

g.   I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances.  That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

h.   I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug traffickers.  These secure locations include, but are not limited to, safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence;

i.   I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers.  These items are maintained by the traffickers within residences (including attached and unattached garages), businesses or other locations over which they maintain dominion and control;

j.   I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k.   I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities.  To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

3

l.      I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

m.      I know drug traffickers take or cause to be taken photographs of themselves; their associates, their property and their drugs.  These traffickers usually maintain these photographs in their possession; and

n.      I know a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases drugs from a target.  The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded buy money.   When an informant is used, he/she is searched for contraband, weapons, and money before the operation.  The informant is also wired with a concealed body recorder and monitoring device.  When the transaction is completed, the informant meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents.  The informant is again searched for contraband, weapons, and money.  Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded.

6.      In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

7.      This affidavit is submitted in support of an application for a criminal complaint, arrest warrants, and a search warrant for property described in Attachment A, for violations of federal law, including violations of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B) and 846, Conspiracy to Possess with Intent to Distribute and to Distribute in Excess of 100 Kilograms of Marijuana, a Schedule I Controlled Substance; and, Title 18, United States Code, Sections 1956(h) Money Laundering and Conspiracy to Commit Money Laundering; and, Section 2.

8.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts.   Because this affidavit is being submitted for the limited purpose of securing a search warrant and criminal complaint, I have not included each and every fact known to me concerning this investigation.  I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations set forth above occurred and that probable cause exists to believe that the property described in Attachment A, incorporated herein by reference, contain the items that are described in Attachment B.

## II.     INDIVIDUALS FOR WHOM A CRIMINAL COMPLAINT IS SOUGHT

|    | NAME | DATE OF BIRTH |
|----|------|---------------|
| 1  | ROBERT K. MALKIN | -1956 |
| 2  | SETH C. JACOBS | -1990 |
| 3  | LEV B. REYS | -1983 |
| 4  | JASON J. MALKIN | -1987 |
| 5  | MOHAMMED E. OMAR | -1993 |
| 6  | ALAE ARBI | -1990 |
| 7  | NAHOM HAGOS | -1989 |
| 8  | SCOTT A. JUNGWIRTH | -1960 |
| 9  | FREDRIC H. BIRAULT | -1932 |
| 10 | LACHELLE COOK | -1987 |

## III.     PROPERTIES FOR WHICH SEARCH WARRANTS ARE SOUGHT

9.     For the reasons discussed herein, there is probable cause to believe that located at and in the following property, more fully described in Attachment A, are items that constitute evidence of money laundering, including violations of Title 18 United States Code, Sections 1956 and 2.

a.     ▬▬▬▬▬▬▬▬▬▬▬▬ – Primary residence of Corianne Markowski.  A check of WE Energies revealed that there is an open account at this address in the name of Corrianne Markowski for Apartment #1.  In addition, her Nissan Maxima is registered to the same address as is her account at U.S. Bank.

5

10.     The following sub-sections set forth various types of information obtained during this investigation regarding the locations and persons described above.  Such information includes, but is not limited to the following: (1) information obtained from confidential sources; (2) electronic surveillance; (3) recorded conversations; subpoenaed documents; and (4) physical surveillance.

## IV.    PROBABLE CAUSE

### A. Background of the Investigation

11.     I believe  that the marijuana trafficking and money laundering activities of members of this group began on or before at least the beginning of 2015 based upon all investigative activities undertaken during the investigation. The investigative activities included, but are not limited to, confidential informant (CI) interviews, other witness interviews, telephone, banking, airline, car rental and other documentary analysis.

12.     In 2017, members of the Milwaukee, WI Police Department initiated an investigation into a large-scale marijuana drug trafficking organization (DTO) led by Josef K. Habib and others. Habib acquired large shipments of marijuana from out of state source(s), which Habib then distributed in the greater Milwaukee area. Habib was also identified as utilizing stash locations in the greater Milwaukee area, including in the cities of Milwaukee and Greenfield, WI.

13.     On January 8, 2018, law enforcement conducted surveillance at an identified stash location at ███████████████████████████████████ and observed a vehicle known to be driven by Habib, a black Nissan Maxima, WI license 242LWL, parked in a visitor parking stall at ███████████████, near the garage for apartment #207. The overhead garage door on the attached garage for #207 was fully open.

14.     Law enforcement subsequently observed a Toyota Highlander vehicle with VA

license plates arrive and drive into the open garage for apartment #207. The garage door then immediately closed.

15.    Approximately 20 minutes later, the overhead garage corresponding to apartment #207 opened, and law enforcement observed a white male enter the driver's seat of the Toyota; Habib stood in front of the Toyota. The Toyota pulled out and drove away. Habib entered the Nissan Maxima and drove it into the garage for apartment #207, and the overhead door closed.

16.    Approximately 25 minutes later, the overhead door of the garage for apartment #207 again opened, and the Nissan Maxima exited. Law enforcement observed that Habib was the driver and sole occupant of the vehicle.

17.    A traffic stop was conducted of the Nissan Maxima, driven by Habib. Law enforcement authorities detected an odor of marijuana emanating from the vehicle, and observed a large black plastic garbage bag on the rear passenger seat. Based upon the earlier investigation, law enforcement believed that Habib used these garbage bags to transport quantities of marijuana. A search of the garbage bag revealed foil sealed packages each of which contained suspected marijuana.

18.    A complete search of the Nissan Maxima revealed a total of approximately 64 pounds of suspected marijuana within the trunk and rear passenger area of the vehicle. A field test conducted on the suspected marijuana yielded positive results for the presence of THC.

19.    On January 8, 2018, law enforcement authorities also conducted a stop and search of the Toyota Highlander. This search revealed approximately 160 pounds of marijuana and in excess of $300,000 in U.S. currency.

20.    Search warrants were subsequently executed on January 8, 2018 at ███████████
███████████████████████████████, believed to be the stash location, and at the

7

residence of Habib, located at ████████████████████████████.

     21.    Law enforcement found approximately 206 pounds of marijuana at ████████ ████████████████████ Additionally, law enforcement located and seized approximately 16 pounds of marijuana, in excess of $21,500 in U.S. currency, and a loaded .40 caliber pistol from ████████████████████. Also seized were items consistent with the packaging and distribution of controlled substances.

     22.    The majority of the marijuana seized was contained in mylar vacuum sealed bags, some within black plastic construction bags.

     23.    Rental documents obtained for the stash location at ████████████████ revealed that it had been rented in 2017 by Fredric Birault, and an individual named Larry Peters was the contact name for Birault, with an email address contact of larrygoeshardaf@gmail.com. Larry Peters was subsequently determined to be an alias name of Lev Reys and the email address larrygoeshardaf@gmail.com was determined to be an email address associated with Lev Reys. The subscriber for utilities in the stash apartment were in the name of Birault.

     24.    When Habib moved to Milwaukee in approximately December 2016, law enforcement learned that Habib resided at ████████████████████. The subscriber for utilities at the Kilbourn Avenue location were in the name of Robert Malkin. Habib resided there until February, 2017 when he moved to another stash location at ████████████ ████████.

     25.    Rental documents obtained for ████████████████████, located in the same apartment complex as ████████████████, revealed that the ████████████ location was rented by Robert Malkin in February 2017. For the rental application credit/income fields on the application, Malkin supplied copies of three checking account statements for a joint

account at JPMorgan Chase Bank, in the names Robert Malkin and S███ M███, Robert's daughter, Account #***0130.    The account mailing address on the two most recent statements (December 2016 and February 2017), listed ███████████████. The address on the statement for January of 2016, which may have been provided in error, listed an address of ███████████████ The insurance for the apartment rental was under the names Robert Malkin and S███ M███, with an address of ███████████████. Robert Malkin paid the initial monthly rent of $1,130 for this stash location in money orders.   The utilities were subscribed to in S███ M███ name at the ████████ apartment.

26.    Rental documents obtained for the residence of Josef Habib, ███████████ ████████ revealed that the apartment had been rented by Corianne Markowski, the girlfriend of Josef Habib, in April 2017. In the rental application, Markowski listed her employment since 2012 as Malkin Properties, ███████████████. Robert Malkin was listed as Markowski's supervisor with a contact telephone number of █████████, a number known to be utilized by Robert Malkin. Markowski also listed her previous residence as an address known by law enforcement through database checks as a residence owned by Malkin Properties in West Mifflin, PA.

27.    Information received from the WI Department of Workforce Development regarding Markowski's claimed wages revealed she lived in WI from 2012 - 2017; not, ████ ███████████████, as alleged on her rental application.

## B. Historical Information

28.    In January 2018, a confidential informant (CI) began cooperating in the continuing investigation into the DTO.  The CI provided information about the membership, structure, and customs of the interstate marijuana DTO emanating in CA.  The CI's information has been corroborated by information obtained from various pubic databases, documents obtained during

the investigation, asset and ownership records, law enforcement records, physical observations, and review of recorded jail calls. Such information will be detailed below. The CI's information has never been found to be false or misleading. The CI has no criminal record and is receiving consideration in connection with a pending drug case from the United States Attorney's Office for his/her cooperation with law enforcement. The CI has also received monetary compensation in the form of covered expenses in exchange for his/her cooperation with law enforcement. For these reasons, I consider the CI to be reliable.

29.     The CI stated an individual named Bob, subsequently identified as Robert Malkin, obtained in excess of 1,000-pound quantities of marijuana in CA, which were subsequently transported by semi-tractor trailer to a location in MD. Parts of the shipments were then distributed to various locations in the U.S., including Virginia/Washington D.C. areas; Pittsburgh, PA; North Carolina; and Milwaukee, WI. The CI further stated Robert Malkin operates a property management company and is suspected of laundering drug proceeds through the company by purchasing properties.

30.     In 2013 and 2014, the United States Postal Service seized and forfeited mailed parcels from Robert Malkin to his wife, S███ M███, which contained large sums of currency. In 2013, $25,000 was seized, and in 2014, an additional parcel containing over $149,000 was seized. Based upon a civil forfeiture complaint filed in U.S. District Court, Central District of CA, in July 2014, the 2014 parcel was shipped by Robert Malkin in Clairton, PA to S███ M███, at a UPS store in Ventura, CA. The telephone number used by Robert Malkin on the parcel mailing in 2014 was ███████.

31.     The CI further provided information regarding the hierarchy of the DTO. According to the CI, Robert Malkin is the financier of the marijuana trafficking organization. Lev

Reys was in charge of the transportation of the marijuana from CA to MD, and other locales. Seth Jacobs held a similar status in the organization as the main distributor/overseer of the Virginia/MD/D.C. marijuana distribution. Joseph Habib directed aspects of the East Coast operation along with running the Milwaukee market. Nahom Hagos[1] and Alae Arbi sold quantities of the shipments in the MD/Alexandria Virginia and Washington D.C. areas on behalf of the organization.

32.    In 2016, Seth Jacobs was named in a DEA investigation when law enforcement seized $29,950 in suspected drug proceeds from him at Dulles airport.

33.    During the course of the investigation, case agents learned that Jason Malkin also participated in the operation logistics of the DTO as set forth below.

34.    In November 2017, Lev Reys recruited the CI to move into and reside at a stash location in Germantown, MD. The CI met Lev Reys through a mutual associate, Fredric Birault, both of whom the CI knew to reside in CA. Birault had advised the CI that Reys was looking for someone to assist in the organization's interstate marijuana trafficking organization and oversee the marijuana stash and off load locations in MD, and Reys would pay the individual for those duties. Birault stated he declined the offer as Birault did not wish to move to MD. Reys advised the CI that a coconspirator named "Scotty," subsequently identified by law enforcement as Scott Jungwirth, had occupied the MD stash house just before the CI. Reys stated Jungwirth had been tasked with the same duties as the CI, but Jungwirth no longer occupied the stash house. Jungwirth

---

[1]   In 2011, Nahom Hagos was one of 18 individuals charged by the U.S. District Court in Alexandria, Virginia with conspiracy to distribute marijuana. The individuals obtained shipments of marijuana from California and distributed it in that district along with at numerous college campuses in other states. Hagos pled guilty and was sentenced to 18 months prison along with three years of supervised release.

had a quantity of marijuana shipped or delivered to the stash house. Having the marijuana shipped to the stash house was against the rules of the organization.  The organization required that the location of the stash house be kept secret; mailings to the stash house were not allowed to maintain the integrity of the organizations' use of the location as a stash house.

35.    According to the CI, the semi-tractor trailer shipments of marijuana that arrived from CA were off loaded from hidden compartments in the trailer at a hangar in Hagerstown, MD. Two locked large steel construction bins in the hangar were used to store marijuana when the trailers were picked up.

36.    The marijuana was then transported for re-packaging and distribution at the stash house in Germantown, MD. The CI was responsible for oversight of the shipments of marijuana upon their arrival in MD by keeping accurate counts of the weights of marijuana that were shipped to the hangar and processed at the stash house.

37.    The CI was in charge of the inventory of the bags in the hangar and upon obtaining quantities of marijuana, the CI resealed and renumbered the bags with the current accurate count of the bags/pounds. The marijuana was packaged in mylar bags and vacuum sealed bags inside black plastic construction bags.

38.    The CI was also responsible for collecting, processing, and packaging large quantities of currency from various coconspirators that represented the proceeds from marijuana sales.

39.    After the CI moved to the stash house in Germantown, MD just before Thanksgiving 2017, Reys took the CI shopping for house supplies and food at a Wal-Mart near Germantown. A day or two later, Reys and the CI went to CubeSmart in Gaithersburg where an interior storage unit, #███, was rented. Reys told the CI to put the rental in the CI's name, and

Reys paid for the rental. Reys then purchased a Rigid steel construction bin. Reys and the CI transported it to CubeSmart and put it in the storage unit. Reys provided the CI with the spare keys for the storage unit lock and two padlocks that he put on the construction bin.

40.   According to the CI, the storage unit and bin were used for storing the U.S. currency that the DTO accumulated through its marijuana sales before it was transferred to the hangar. At the hangar, the cash was loaded into hidden compartments in the semi-trailers for transport to CA.

41.   The DTO used hidden compartments in the semi-trailers to transport the marijuana and marijuana proceeds. The trailer transporting marijuana from CA to MD contained what appeared to be lumber stacks, but the lumber stacks were hollowed out on the inside with the top layer hinged so that the entire compartment could be accessed. The other trailer, which transported the currency back to CA, contained a fake movie production set with equipment inside, restrooms, generators, and other similar detailing. Currency was hidden in a large steel Rigid construction bin in the front of the trailer, which area could only be easily accessed by crawling under the generator mounted near the rear trailer door and over other equipment.

42.   The truck drivers hauling the trailers allegedly did not know that they were transporting either marijuana or money. Reys stated that they would never use the same driver more than once.

43.   The CI observed approximately 30-40 black plastic construction bags within the fake lumber stacks and each construction bag normally contained six to eight mylar bags, each of which generally contained five pounds of marijuana. The CI stated that the shipments from CA contained approximately 1,200-1,600 pounds per shipment.

44.   The CI was present at the hangar on approximately four occasions when semi-trailers were delivered or taken out, and Reys was present on two occasions.

13

45.     On approximately three other occasions, the CI went to the hangar alone with instructions from Jacobs to bring back five to six contractor bags of marijuana to the MD stash house.

46.     The CI identified Josef Habib as a Milwaukee based distributor for the DTO. The CI had obtained large quantities of U.S. currency from Habib, which the CI then transported back to MD.

47.     The CI first met Habib when Jacobs and Reys directed the CI to fly to Milwaukee. The CI flew to Milwaukee on Southwest Airlines from Baltimore and the CI rented a car, believed to be from Enterprise. The CI was directed to contact and meet with "Joe." The CI subsequently met Habib by Hamburger Mary's in Milwaukee. Habib delivered money to the CI, and the CI observed that Habib drove a black car. The CI then drove the money to the stash house in Germantown, MD. On another occasion, the CI met Habib at the stash house in MD.

48.     The CI identified Lev Reys as a close associate of Robert Malkin. The CI stated Reys' role in the DTO was overseeing transportation of the shipments of marijuana from CA to MD and other locations. The CI stated Reys has told the CI that Reys' goal is to accumulate numerous properties in the Pittsburgh, PA area utilizing marijuana distribution proceeds and then accumulate further wealth through ownership and rental of the properties.

49.     The CI identified an individual named Seth, subsequently identified as Seth Jacobs, as a main MD/Virginia based distributor for the DTO who frequented the stash house in MD and oversaw a daily worker at the stash house.

50.     The CI retained receipts from the CI's trips which the CI then provided to Jacobs. Jacobs reimbursed the CI with cash for the CI's drug-related expenses.

51.     The CI also identified an individual named Alae/Elae subsequently identified as

Alae Arbi, and an individual named Nash, subsequently identified as Nahom Hagos, as individuals that frequented the stash house in Germantown, MD and obtained multi-pound quantities of marijuana weekly, which Arbi and Hagos sold in the MD/Virginia/Washington D.C. areas on behalf of the DTO.

52.     Arbi normally came to the stash house with Seth Jacobs and ran errands for him. Arbi also ran a marijuana delivery service for Jacobs in the Washington, D.C. area. Jacobs and Arbi had a business name on Weed Maps, an app that each of them had installed on their cell phones. Arbi also came to the stash house at night to smoke marijuana.

53.     On average, Hagos came to the stash house every few days, sometimes multiple days in a row, and the CI overheard Hagos telling a stash house worker that Hagos needed 40 units of something, a few units of something else, which the CI knew to be Hagos obtaining pounds of different strains of marijuana.

54.     The CI identified the CI's two cellular telephone numbers. The CI also stated that a cellular telephone that the CI had left at the stash house in MD had been provided to the CI by Lev Reys in November 2017 as a cellular telephone number to utilize for contacting coconspirators in the DTO. The CI had changed cellular telephones due to issues with service.

55.     Reys and Jacobs told the CI that Jungwirth was an older white male. The CI was also told that Jungwirth, the individual previously performing the duties of the CI, previously drove the Toyota Highlander, and it was purchased as the transportation vehicle for Jungwirth. Subsequently, this vehicle was provided to the CI to use for deliveries and pickups, and other drug-related duties.

56.     A check on the title history of the Toyota Highlander revealed that it had been titled in the name Scott Jungwirth, ██████████████████ on August 1, 2017. The vehicle title

was then transferred into the name of the CI on November 21, 2017.

57.     The CI stated that on the day of Habib's arrest, Reys first directed the CI to stop at another stash location in Milwaukee, which the CI identified as ████████████████. Prior to the CI's departure from Germantown, MD, Reys had given the CI a set of keys for the apartment. Reys directed the CI to take the marijuana from the ██████ location and deliver it to Habib. The CI estimated there were approximately 300 pounds of marijuana at the stash house on 107th street.

58.     The CI then took the marijuana to Habib at the ██████████ location. Habib examined the different strains of marijuana and took approximately 140 pounds of the marijuana, but left the CI with the remaining amount. Habib also put the bags and boxes containing the U.S. currency in the Highlander for the CI to take back to MD.

59.     The CI was uncertain about what to do with the marijuana as the CI had never driven marijuana that had already been delivered to another city back to the MD stash house. The CI attempted to contact Jacobs and Reys via the Telegram app they utilized on their cellphones, but neither answered.

### C. Continuing Investigation

60.     On January 9, 2018, case agents conducted a consent search at ████████████ ████████████ Law enforcement observed that no one resided in the apartment. Items observed and seized included plug-in air fresheners, a box of rubber gloves, and loose locksets for doors. The air fresheners were the same type as what had been observed at the stash house at ███ ████████████.

61.     Records received from the property management company for ████████████ ████████████ revealed that the rental application was in the name Fredric Birault, ████ ████████████████ with an application date of September 20, 2017 and rental date



16

starting October 20, 2017. An email address of larrygoeshardaf@gmail.com was provided along with a verification of income letter from a Larry Peterson, telephone number ███████, email address larrygoeshardaf@gmail.com, stating that Birault was employed by Oasis Management, Beverly Hills, CA as a property manager since 2012.  The telephone number and email address are known to be used by Reys.

62.    On January 9, 2018, law enforcement from Montgomery County Sheriff's Department executed a search warrant at the stash house in Germantown, MD based upon the information developed in this investigation. A search of the residence revealed evidence consistent with the information provided by the CI that the residence served as a stash location for the marijuana distribution organization.  Law enforcement recovered thousands of unused vacuum sealed bags, marijuana remnants, a money counter, latex gloves, and the cellular telephone provided by Reys that the CI identified as located at the stash house.

63.    In January 2018, case agents traveled to MD with the CI and conducted a follow-up consent search at the stash house located in Germantown, MD utilizing the CI's keys.  At that time, law enforcement seized additional items, including a crumpled Burke & Herbert Bank ATM debit card receipt dated December 10, 2017 from a branch at ███████████████, ███ from the basement, and paid parking stub, dated December 20, 2017, from a parking garage in Washington D.C. from the garbage.

64.    Bank records and parking management company records received via subpoena revealed that the debit card receipt corresponded to a bank account of Alae Arbi. The parking stub receipt was parking paid for using a credit card issued to Nahom Hagos.

65.    A review of records received from Burke & Herbert Bank reveal that the debit card ATM withdrawal receipt seized from the "stash house" in Germantown, MD, is tied to checking

account number *4043, in the name of Alae Arbi of ███████████████████████,
███████████.

66.     Records received from Burke & Herbert Bank reveal that the debit card used for
the charge on the parking stub receipt seized from the "stash house" in Germantown, MD, is a
match to a debit card for a checking account *1403, in the name of Nahom Hagos of ███████
███████████████████.

67.     Law enforcement also conducted consent searches at the CubeSmart storage unit in
Gaithersburg, MD and the rented warehouse hangar in Hagerstown, MD.

68.     Upon searching the storage unit, the special agents observed a Rigid steel
construction bin inside the unit, which was padlocked. A set of keys recovered from the stash
house in Germantown, MD opened the locks on the bin. The bin was empty.

69.     A review of surveillance video received from CubeSmart showed Reys and the CI
entering the storage unit in November 2017 on the day of the initial rental and a few days later.
Both are observed on video unloading the Rigid steel construction bin from the Toyota Highlander
and taking it inside the storage unit.

70.     Upon searching the warehouse hangar, a tractor-trailer was observed parked inside.
The interior of the trailer contained two false lumber and plywood stacks. The top layer of false
lumber was hinged on each stack, which revealed empty hollowed out compartments. There were
also two additional Rigid steel construction bins in the warehouse hangar.

71.     A check on the CA license plate on the trailer in the hangar revealed that the trailer
was registered to Fredric Birault, at ███████████████████

72.     Subpoenaed records were obtained from World Wide Freight Carrier, LLC. On
April 9, 2018, Robert Malkin, from email address bobmalkin@gmail.com, communicated with an

employee at World Wide Freight Carrier regarding "Trailer pick up." Robert Malkin requested "pick up" at " ███████████████ ," which case agents know is the address for the warehouse hanger previously identified by the CI, and examined by case agents. Robert Malkin provided a delivery address of " ██████████████████████ ." The shipping rate was listed as $4,895.00.

73.    Rental documents obtained for the stash house in Germantown, MD revealed that the residence was rented by Robert Malkin in July 2017. Rental documents for the warehouse hangar revealed that it was also rented by Robert Malkin in September 2017.

74.    During the week of January 8, 2018, an attorney contacted law enforcement and advised that an individual who identified himself by the name of "Seth" had contacted the attorney regarding the CI and inquired as to the attorney representing the CI. The attorney provided the telephone number that "Seth" called from as a "707" area code number. The CI stated the CI doesn't know any other individuals named Seth other than Seth Jacobs. The CI suspected that Jacobs was the individual that called the attorney because Reys had told the CI in the past that if the CI was ever arrested that the organization would obtain an attorney for the CI.

### D. DTO's Methods of Communication

75.    The CI identified various telephone numbers and usernames of the coconspirators from an encrypted cellular telephone application called Telegram. This application allowed the coconspirators to contact one another to avoid detection from law enforcement because it provided a "secret chat" feature. The CI stated that the usernames the coconspirators utilized in the app were fictitious names that the various coconspirators had chosen. The CI stated all of the known individuals primarily used the secret chat and voice calling on the Telegram app. The individuals whom the CI identified also frequently changed cellular telephone numbers to avoid detection by law enforcement. The CI knew Jacobs carried three cellphones at a time, and Reys used more than

19

one cellphone.

76.     Law enforcement reviewed the cellular telephone of the CI and the Telegram app on the CI's cellular telephone. The CI identified the following names and Telegram app contacts: a name of Joe with a fictitious name of Steven Trace and username @Ralfy434, Telegram app telephone number ███████ as the contact information for Josef Habib; the name Larry Peters and username @LarryPeters, Telegram app telephone number ████████ as the contact information for Lev Reys; a name Alle with no telegram telephone number saved as the username for Arbi; a name "Ben," whom the CI identified as a daily stash house worker, with a fictitious name of @timwilliams (a/k/a Paul Ramon) with no telephone number saved as "Ben;" the name Bob with username name BM with no telephone number saved as Robert Malkin; and the name Seth with the fictitious username Rick Orozco as the username of Jacobs.

77.     Outgoing calls were observed to the Telegram usernames of Reys and Jacobs during the time period after the CI left Habib's ████████████. stash location on January 7, 2018.

78.     There were also numerous secret chats between the CI and the other referenced user names.

79.      Law enforcement also observed numerous pictures time stamped December 21, 2017, of notebook pages containing handwritten notations of abbreviated names of marijuana strains with numbers next to the abbreviations on the CI's phone. The CI stated that they were pictures taken by the CI that the CI then sent to Reys and Jacobs documenting the pounds of various types of marijuana that was remaining on that date at the hangar. The CI had been directed to pick up a quantity of marijuana at the hangar and bring it back to the stash house in Germantown, MD.

80.     On January 25, 2018, law enforcement obtained search warrants from the

Honorable Magistrate Judge William E. Duffin for the two cellular telephones of Habib, ▮▮▮▮▮▮

▮▮▮ and ▮▮▮▮▮▮▮▮. A review of the telephones revealed contacts in Telegram with a name

entered as Bdigi, telephone number ▮▮▮▮▮▮▮ (known to be the telephone number of Robert

Malkin), and encrypted conversations between that number and Habib's cellular telephone.

Additional telegram usernames were Paul Ramon with username @Timwilliams (Id'ed by the CI

as the individual "Ben," whom the CI identified as a daily Maryland stash house worker) with calls

between the two.

81.     Law enforcement also observed numerous chats and secret chats between Habib's

cell phone and other unidentifiable uernames on the Telegram app. Some of the chats contain

pictures of notebook pages depicting handwritten drug ledgers, including various marijuana strains

with numerical amounts and pages containing monetary amounts, including pages titled "Milw.

Inventory," and D.C. Inventory with dollar amounts over $1,000,000. Some of these chats were

with Paul Ramon.

82.     Database checks on the telephone number ▮▮▮▮▮▮ revealed the telephone

number is listed to Robert Malkin.  Further records obtained through subpoenaed documents

related to rental locations, banking and other records revealed Robert Malkin uses telephone

number ▮▮▮▮▮▮

### E. Habib Directed Wiring of Drug Proceeds

83.     I have reviewed numerous recorded jail calls from the Kenosha County Detention

Center where Josef Habib is jailed on his pending indictment through the U.S. District Court,

Eastern District of WI. Habib placed the calls from January 10, 2018 to June 20, 2018 and utilized

his and various other inmates' personal identification numbers to place the calls. In addition, Habib

has had hundreds of calls with Mohammed Omar at telephone number ▮▮▮▮▮▮ during this

time, both directly dialed and through three-way calling using various females who are the

21

girlfriends or otherwise related to the other inmates housed with Habib.  Through Habib's use of

three-way calling, I believe he attempted to avoid detection by law enforcement thereby shielding

his contacts and concealing his activities from law enforcement.  Habib also directed Omar to place

three-way calls to these female individuals and others. Omar also utilizes different unidentified

cellular telephones. The recorded calls obtained by law enforcement revealed that they discussed

Habib calling Omar at other numbers but did not verbalize the numbers during the calls. Follow

up calls between Habib and Omar referenced calls and conversations that had previously occurred,

but were not located on the jail system recording. These calls were not found as Habib was using

other inmates' personal identification numbers (PIN) and the jail recording system is searchable

based upon inmate personal identification numbers and/or via a known telephone number.

84.      During the calls, Omar, under the direction of Habib, has wired tens of thousands

of dollars through Moneygram, Western Union, and Wal-Mart to numerous individuals, primarily

females who are associated with the other inmates. The female individuals then utilized the monies

to purchase cellular telephones for Corianne Markowski, Habib's girlfriend and co-defendant, and

others, and/or supply the monies directly to Markowski.  The females are allowed to keep a portion

of the wired funds. Habib provided the names and telephone numbers to Omar for whom to send

the funds. Habib and Omar discussed Omar's use of Habib's "escrow" (believed to be saved drug

proceeds), and also discussed obtaining the money from co-conspirators.

85.      Omar related to Habib on various calls that first Moneygram and then Wal-Mart no

longer allowed Omar to send monies through their business because of the large amount of cash

Omar had wired. Omar related that he was "hot" because he had wired such a large total of

currency. On one call, Omar stated he had already sent $20,000 in total from one of the businesses.

Habib then directed Omar to talk to various people about using their names to wire the monies on

behalf of Habib/Omar. In subsequent calls, Omar stated he had recruited others to do so. Habib continued directing Omar to wire monies on the jail calls continuing through June 20, 2018, the date of the last recorded calls received from the Kenosha County Detention Center. Further calls between Habib and Omar after that date were not located because Habib used another inmate's PIN, and more frequently used three-way calling in June.

86.    Habib has directed Omar to wire amounts ranging from $300 to $850. On numerous other jail calls, Habib has directed Omar to obtain debit/gift cards from stores in amounts primarily of $500 increments (up to four $500 individual cards at a time) and send them to various individuals. Habib then directed Omar to text or call the female individuals to obtain their addresses so that Omar would be able to mail the gift cards to them. At the direction of Habib, large amounts of commissary money are also being paid by Omar and deposited onto Habib's inmate account. Based upon my familiarity with the investigation, I believe Habib is using the commissary to provide benefits to other inmates to obtain the names of other individuals to whom Habib and Omar can funnel money to avoid detection.

87.    Subpoenaed records received from Moneygram and Wal-Mart reveal that from February to May 8, 2018 Omar, on behalf of Habib, has sent 46 wire transfers totaling in excess of $29,000 in currency to these individuals. The address listed for OMAR in all of these transactions was ███████████████████████

88.    Habib's jail calls further reveal that Omar is a conduit for passing on information to Habib's criminal associates, warning them regarding whom to deal with, how to avoid detection by law enforcement, and what Habib has learned about the investigation from his attorney, discovery, and others. Included in these conversations, Habib told Omar to relay to the others not to use the Telegram app anymore. Omar advised Habib that individuals are worried about what

was said at Habib's detention hearing about Telegram messages, and that one individual is worried about the airline flight information. Habib told Omar to tell him that law enforcement can't do anything "just because a felon paid for a flight." (Hagos, a convicted felon, paid for a flight for Habib in January 2017 when Habib flew from San Francisco, CA to Milwaukee, WI).

89.     On numerous other calls, Habib directed Omar to get in contact with "Black," "Fat Black," and "Fat Dude," to obtain money from him, and to relay information to him. In the 2011 Virginia indictment, Hagos was identified as having the nickname "Fat Boy."

90.     Specifically, Omar sent numerous money orders to Lachelle Cook under the direction of Habib beginning in February 2018 through at least June 2018. Recorded jail calls revealed that Habib had a large volume of calls with Cook between February and the end of May 2018; both direct calls to Cook and three-way calls through Omar. Habib discussed the wired funds with Cook, advising her as to the amount and dates Omar wired the monies to her and she in subsequent calls acknowledged having received them from Omar. During various calls between Habib and Cook regarding the wired monies sent to Cook, Habib directed Cook to provide some of the monies to Markowski, purchase cellphones for Markowski and others, and put money on accounts for the cellphones and Cook's own cellphone through the jail telephone calling system. Habib also allowed Cook to keep some of the monies in payment for Cook's services for Habib.

91.     Habib, Omar, and Cook also discussed on numerous occasions Omar having a car shipped to Cook and on other occasions, another car shipped to a different female individual. Habib advised Omar that Habib will pay for the vehicles and Omar says he will go through "Carline" where Omar has access to cars. Carline is located in Stafford, VA and Omar discussed his association with the business, such as buying cars from auctions. During another call, Omar told Habib that he is worried because someone had talked to customers of Carline. Omar further related

24

that someone is looking into the business, and Omar referred to the Toyota Highlander. Habib reassured Omar and told him not worry. Omar stated that the vehicle was registered in the "white boy's" name from "CA."

92.    Habib and Omar contacted Cook at telephone number ▉▉▉▉▉▉ and at later dates, a different telephone number. Subpoenaed records for telephone number ▉▉▉▉▉▉ revealed that the subscriber was Lachelle Cook, with an address of ▉▉▉▉▉▉▉, ▉▉▉▉▉▉.

93.    Cook received $7,100 from Omar which was wired from Moneygram and Wal-Mart between February 21 and April 22, 2018. Cook used her WI driver's license as proof of identity with an address provided of ▉▉▉▉▉▉ and telephone number ▉▉▉▉▉▉ Based upon jail calls, Omar, under Habib's direction, wired additional monies to Cook, up through May 25, 2018.

94.    The dates of the wired monies being sent by Omar and received by Cook match the dates of the recorded jail calls between Habib, Omar, and Cook relating to the wire transfers.

95.    As an example, on February 21, 2018, Habib and Cook talked numerous times. Cook advised she was obtaining another cellphone for Markowski. On that same date, Omar wired Cook $500.

96.    Between February 21 and 28, 2018 Habib had a call with Cook during where Markowski got on the line, which indicates Markowski was present with Cook. On another call, Habib and Cook referred to Cook being on the east side of Milwaukee.

97.    A utilities check revealed that Markowski is the subscriber of utilities at ▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉ and subpoenaed bank records received from U.S. Bank for accounts held by Markowski also list to that address.  This address is located on the east side of

Milwaukee.

98.     In another call, the inmate housed with Habib, who is related to Cook, was on a call with Cook while Habib was talking to Markowski in the background. Markowski relayed to Habib what she thought Cook looked like when she met Cook.  Habib relayed Markowski's description of Cook to the inmate, who in turn told Cook. On another, occurring on February 24, 2018 Habib told Cook to put $30 from what was sent on the account for the cellphone that Cook provided to Markowski. On that same date, Omar wired $700 to Cook. On May 24 and 25, 2018 there were repeated calls between Habib and Cook during which Cook stated she was trying to contact "Cori." Habib then told Cook to try calling Markowski again on Cook's other cell, and Cook references trying to reach Markowski to drop off money to her. On a subsequent call, Cook told Habib she had spoken to Markowski.

99.     Subpoenaed records received from Western Union identified Cook having wired a total of $478 between March 1 and June 2, 2018 to Global TelLink Advance Pay, known to be the jail telephone calling system account crediting payment processing for the Kenosha County Detention Center. The monetary amounts ranged from $25 to $50 for each wire transfer.

100.    Two of the 46 wire transfers OMAR sent were to a "Jacob Seth" of ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, via a Wal-Mart store in Oxnard, CA. Robert MALKIN and Lev REYS reside near Oxnard, CA. OMAR wired $1,000 to "Jacob Seth" on February 5, 2018 and $1,500 to "Jacob Seth" on February 26, 2018. Thus, it appears that OMAR attempted to disguise JACOBS' true identity.

101.    Excluding the wire to Seth JACOBS on February 5, 2018, OMAR's first nine wires were to another female individual as directed by Habib. Two of the wire transfers received by the female individual were then wired by the female to Markowski, including a $600 wire to

Markowski on February 3, 2018 and a $400 wire to Markowski on February 15, 2018.

    **F.   Financial, Travel, and Telephone Data Analysis**

**Financial Information**

    102.   Robert Malkin operates Malkin Properties LLC and database checks reveal that Malkin Properties manages and sells properties in southern CA and Pittsburgh, PA areas.

    103.   A check through property ownership databases and subpoenaed records revealed that Lev Reys purchased four properties in Pittsburgh, PA in June and July 2015, three from Robert Malkin, and one from his son A███ M███.

    104.   On or about May 23, 2017, Robert Malkin purchased a property at ████████ ████████████████ in the name of ROBERT K. MALKIN & ASSOCIATES, INC. for $220,000. No mortgage was located for the property. REYS has traveled to Garberville on at least September 15, 2017, September 24, 2017, and October 6, 2017, as per his credit card transactions. Subpoenaed documents have also placed Jason Malkin and Scott Jungwirth in Garberville.

    105.   Subpoenaed bank and other financial accounts revealed that Robert Malkin established a credit card through Capital One Bank for use by Jason Malkin (hereinafter referred to as "the Jason Malkin card") and Scott Jungwirth (hereinafter referred to as the "Scott Jungwirth card") to cover expenses associated with the marijuana distribution activities; i.e.: Bob Malkin appears to be the primary account holder, with Jason Malkin and Scott Jungwirth being authorized users on the account.

    a.   The "Account Information Sheet" for Jungwirth lists his email as "bobmalkin@gmail.com.

    b.   The address appearing on the monthly statements is: ROBERT K. MALKIN, STE ████████████████████████████.

    c.   Most of the payments against the account balances are listed under Robert

Malkin's name.

106.   Consistent with other financial transactions conducted by DTO members, the payments against the account balances were made with currency equivalents; i.e., money orders, whose purchases appear to have been structured to avoid the need to provide identification to the seller of the money orders. Most of these money orders list Robert Malkin as the purchaser of the money orders and the handwriting appears similar on most of the money orders.

107.   The first known transaction on the Jason Malkin card occurred on September 13, 2016 for a flight in the name Jason Malkin from Los Angeles to Washington D.C. It is noted that an expenditure on another account of Robert Malkin showed expenditure for a flight in the name Robert Malkin from Los Angeles to Baltimore on September 12, 2016.

108.   Jason Malkin incurred travel expenses associated with the cities of Garberville, CA; Milwaukee, WI; Pittsburgh, PA; Germantown, MD; etc. These expenses were most prevalent from September 2016 through July 2017, but others existed.

109.   Scott Jungwirth initially incurred expenses, on the Scott Jungwirth card, associated with Redding and Garberville, CA; however, he began incurring more expenditures associated with MD beginning in August 2017, which corresponds to the July 2017 move-in date of the Germantown, MD stash house. Some of his expenditures include large-value vehicle rentals, consistent with driving across the country.

110.   Credit card expenditures became minimal beginning in January 2018, which corresponds to Habib's arrest.

111.   A review of Robert Malkin's Chase Bank checking account *0404 revealed the following:

    a.   Six checks, made payable to World-Wide Freight, ███████████████

▮▮▮▮▮▮▮▮▮▮ were drawn against Robert MALKIN's account #0404. These checks were dated from December 2, 2015 and July 13, 2017; and ranged in amounts from $3,900 to $4,900. The Memo section on check number 9775, dated August 2, 2016, states "COD Payment– Santa Paula CA–MD". (Note: Lev REYS' telephone tolls reveal that Reys was in contact with ▮▮▮▮▮▮▮, listing to Worldwide Freight's Carrier Division,2115 Stein Dr. Suite 304 Chattanooga, Tennessee.)

112.    A review of Lev Reys Citibank checking and credit card accounts, both personal accounts in his name and business accounts for limited liability corporations (ROI Properties PIT LLC, ROI PROPS JAX LLC), all having a mailing address of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, ▮▮ revealed the following:

a.    Reys checking account *4331 showed 3 money order deposits in 2015 totaling $3000, 2 in 2016 totaling $5600 and 50 in 2017 totaling $47,015. Of the 50 in 2017, 3 listed the alleged purchaser as "Robert Malcom" totaling $2800 and 10 with "Robert/Bob Malkin" totaling $9800.

b.    The "post office #" appearing on most of the money orders reveals that they were purchased in the greater Los Angeles, CA area. However, there is one significant exception; i.e., the $1,000 money order deposited into Reys' account on November 14, 2017 was purchased at post office # 53007 on November 9, 2017, which is in the greater Milwaukee, WI area. Reys' CitiBank credit card #2764 transactions reveal that card was used in the Milwaukee, WI area on that date.

c.    The deposited money orders appear to have the same, or very similar, hand-printing, in that the printing bears a back-slanted tilt. A visual comparison of the hand-printing on the money orders to that found on the signature cards for Lev Reys' business checking accounts at

29

CitiBank; i.e., ROI PROPS PIT, LLC and ROI PROPS JAX, LLC, reveals significant similarities. Also, most of the money orders indicate the proceeds were "loans" or "loan repayments." Thus, it appears that Reys may have been attempting to launder currency through his checking account by (1) using currency to purchase the money orders, recording nominee names as the persons who purchased the money orders and provided them to REYS, and (3) depositing those money orders into REYS' checking account; thereby attempting to conceal the nature, source, ownership, or control of the proceeds.

      d.      Deposited items into the checking account included 6 deposits totaling $39,890 between February 2015 and October 2017 from businesses owned by Robert Malkin (Fresno Valley Partners LLC, Robert K. Malkin & Associates Inc., and Malkin Properties LLC), with the largest deposit being $35,000 on May 28, 2016.

      e.      Withdrawals from the checking account included 10 totaling $91,682.02 between June 2015 and September 2017 payable to businesses of Robert Malkin (Malkin Properties, Robert K. Malkin & Associates Inc., Malkin Properties Inc.) and 1 to Malkin's son, A███ M███

      f.      Nearly all of these transactions between Reys and the business of Robert Malkin were associated with real properties in the Pittsburgh, PA area. The four transactions taking place on or about June 8, 2015 indicate that Lev REYS purchased four real properties from the MALKINS at a cost of approximately $88,000. These transactions were preceded by two currency deposits of $4,000 each and a $10,000 "loan" from A██ R███

      g.      Similarly, a $4,500 payment by Reys to TD Ameritrade on April 15, 2015 as an IRA Deposit was preceded by $3,710 currency deposit.

      h.      Reys Citibank credit card *2764 obtained in 2017 revealed that the monthly

payments were most likely paid utilizing money orders as they were not traceable to any of Reys checking accounts and the balances were paid in multiple transactions, i.e. $3058.23 payment in September 2017 paid with two $1000 payments, one $500 payment and one $558.23 payment, a $4000 payment in October 2017 paid with four payments of $1000 and a $5565.34 payment in November 2017 paid with five $1000 payments and one $655.34 payment.

        i.     The credit card transaction for *2764 also showed multiple travels related to this marijuana trafficking conspiracy.

        j.     One trip occurring September 15-23, 2017 showed travel to Garberville, CA, (9/15/17) back to Los Angeles, (9/17–9/18/17), flight to Milwaukee with rental car in Milwaukee (9/21/17), flight to Baltimore with rental car (9/22/17), and flight to Los Angeles (9/23/17). This trip coincided with time period of rental application at stash location at █████ ████████████████.

        k.     Two trips to Garberville (9/24/17 and 10/4–10/6/17) with flight from Los Angeles to San Francisco and return flight on same day (9/24/17) with gas station expenses in Garberville on that date and 2 night hotel stay (10/4-10/6/17) in Garberville, with associated travel expenses back to Los Angeles on 10/6-10/7/17).

        l.     A trip to MD (9/28/10/2/17) with flight to Baltimore and return flight expense indicated.

        m.     A trip to PA with hotel stay and rental car charges (10/10-10/12/17), a hotel charge in Hagerstown, MD (10/11/17), flight from Pittsburgh to Baltimore with rental car and hotel stay (10/13/17), and possible 2 return flights charged Baltimore to Los Angeles (10/14/17).

        n.     A trip to Chicago/Milwaukee (10/18-10/19/17) with flight from Los Angeles to Chicago with rental car (10/18/17) and two charged return flights from Chicago to Los

Angeles (one flight for 10/19/17 & the other 10/20/17).  On October 20, 2017, Milwaukee area charges exist. This trip coincides with the rental start date at the stash location at ██████████ ████████████.

      o.    A trip to Garberville, Milwaukee, and MD (11/1-11/11/17) with rental car in San Francisco (11/1/17), 2 hotel charges in Garberville with dates of stays for the separate charges of (11/1-11/6/17) and the other (11/4-11/6/17), charges in Los Angeles (11/5/17), a flight from Los Angeles to Chicago with rental car (11/8/17), the Home Depot charge in Milwaukee (11/9/17), and flight from Chicago to Baltimore (11/11/17). This trip coincides with the stash location rental at ████████████████████████.

113.    A review of Seth Jacobs PNC Bank checking account revealed the following:

      a.    Deposits into Seth Jacobs' checking account during 2014 initially consisted only of small currency deposits, most of which were less than $50, but a few that ranged from $100 to $210.  Beginning on March 17, 2017, funds were directly deposited into the account from McLean Youth Soccer.  These direct deposits were usually made on a bi-weekly basis.  The McLean deposits continued into 2017, but in decreasing amounts.

      b.    The vast majority of the deposits made in the years 2015, 2016, and 2017 consisted of currency and were made via Automated Teller Machines (ATM).

      c.    Multiple deposits were frequently made on the same day.  For example, on August 9, 2015, sixteen deposits totaling $4,731 were made into Seth Jacobs' account.  The deposit amounts ranged from $70 to $780.

      d.    Larger deposit amounts often correlated with the purchases of multiple airline tickets (usually to northern CA), hotel costs, and vehicle rentals.

      e.    The six largest deposit amounts were accompanied with currency withdrawals of the same amount. These transactions are indicative of exchanging currency for different denominations or for cashing currency equivalent items; i.e., cashier's check or money order, then depositing the proceeds. For example, on June 5, 2017, a $2,100 currency deposit was made at PNC Bank's Bethesda, MD branch.  On that same date, a withdrawal of $2,100 was also

Case 1:18-mj-00379-TCB   Document 1   Filed 08/02/18   Page 36 of 49 PageID# 36

made. Handwritten on the back of the withdrawal ticket were the words, "Remitter: Robert
Malkin," which likely indicates the cashing of a currency purchased on behalf of the remitter,
Robert Malkin.

   f.  The amount of currency deposited into Jacobs' checking account increased
dramatically in 2015, rising from $1,196 in 2014 to $77,989 in 2015. The amount of currency
deposits increased again in 2016, to $84,171. However, the amount of currency deposited during
the first nine months of 2017 dropped to $48,733.

   g.  On February 22, 2016, the first deposit into Jacobs' account, from
Germantown, MD was made. A total of 129 deposits was made in the Germantown/Gaithersburg
area from February 22, 2016 through September 4, 2017. The locations of the deposits changed
from the Alexandria metropolitan area in north-eastern Virginia in 2014 and 2015 to the
Germantown/Gaithersburg area. In 2017, the deposits were equally split between the Alexandria
metro area and MD.

   h.  During the first six months of 2017, the deposits into Jacobs' checking
account were primarily made in three MD communities; i.e., Germantown, Gaithersburg, and
Bethesda. During the third quarter of 2017 the deposits were made primarily in Alexandria,
Virginia, with a few still being made in Germantown and Gaithersburg. Further, 2017
expenditures from Jacobs' account revealed fewer airline tickets and only a few expenditures in
northern CA. No CA-based expenditures were noted after March 17, 2017. Periodic expenditures
did occur in Gaithersburg, MD into August 2017.

   i.  No expenditures from Jacobs' checking account were made via checks;
thus, the recipients of these expenditures were all identifiable, except for a few website charges.
Very few, if any, expenditures were made to cover normal living expenses, such as groceries and
housing. It is probable that Jacobs' paid those expenses with un-deposited currency.

   j.  Beginning in early 2015, expenditures other than website online billing
services from this account were primarily electronic (debit card) payments for travel-related
expenditures, including numerous airline tickets, rental cars, hotels, gas stations and bus fares.

Most of the travel expenses in 2015 were related to approximately ten trips to northern CA communities, including Eureka, Garberville, and San Francisco. Nearly all of these trips appear to include purchases of three or more airline tickets. Some of the earlier trips to northern CA appeared to involve flights to CA followed by expenditures made at hotels and service stations in states moving from west to east, as well as expensive vehicle rental fees at the end of these trips. Thus, it appears the travelers may have been transporting something from the west coast to the east coast. Further, these trips were almost always preceded by multiple currency deposits into Jacobs' checking account.

k.    Two expenditures totaling $4,525 were made from Jacobs' checking account to Mike's Family Bailbonds of Reno, Nevada, on September 29, 2015. Those payments were surrounded by several "Collect Call Fees." As per Washoe County, Nevada records, Josef Habib was arrested and booked on that date, for possession of marijuana. Expenditures for four airline tickets were made from Jacobs' account the next day, September 30, 2015. Further, a $4,120 currency deposit and a currency withdrawal for the same amount affected Jacobs' checking account that day. A name written on the back of the withdrawal slip was a person that resided in Hagerstown, MD at that time.

l.    Four United Airline ticket expenditures were made on January 7, 2016. A $600 deposit was made into Jacobs' account at a branch in Pittsburgh, PA on January 15, 2016. And, Hyatt House of Pittsburgh, PA expenditures were recorded on January 19, 2016. American Airline ticket records reveal that Robert Malkin flew into Pittsburgh on January 14, 2016 and departed from Pittsburgh on January 17, 2018.

m.    Less than one month later; i.e., on February 9, 2016, Jacobs' checking account incurred its first expenditure from Germantown, MD. This was a $31.30 charge at the Target store. Beginning on February 23, 2016, multiple currency deposits began being made in Germantown, MD. In fact, Germantown became the primary location for deposits into Jacobs' account through the end of 2016 and trips to northern CA continued through 2016.

n.    Despite the many deposits in Germantown, MD, few, if any, hotel

34

expenditures were incurred in that area. Two "Holiday Inn Express GE" expenditures were made on October 24 and October 25, 2016. A "Google" search of that term produced possible Holiday Inn Expresses in several cities, including Germantown, MD and Germantown, WI. Less than two months later; i.e., on December 15, 2016, the two $159.99 expenditures from Jacobs' checking account were incurred at the Intercontinental Hotel in Milwaukee, WI.

114.    Records received from Burke & Herbert Bank for a checking account of Alae Arbi revealed the following:

a.      There were eleven deposits into Arbi's Burke & Herbert Bank checking account number *4043 during the nine-month period from July 2017 through March 23, 2018, totaling $15,839.89. Two of those deposits were in July 2017; the nine remaining deposits did not begin until November 17, 2017. The two July deposits consisted of $2,000 in currency and $59.89 in checks. All deposits from November 2017 through March 23, 2018 consisted of currency, totaling $13,780. Deposits into Arbi's bank account have been all currency since November 2017. Arbi's bank records fail to reveal a legitimate source of income, yet the balance in his account as of March 23, 2018 was $11,578.75.

b.      Withdrawals from Alae ARBI's Burke & Herbert Bank checking account number *4043 consisted primarily of debit card transactions and ATM withdrawals. The debit card transactions were primarily in the Boston, Massachusetts area prior to the multiple currency deposits beginning in November 2017. There was no significant debit card activity from September 12, 2017 through mid-January 2018, despite the seven currency deposits, totaling $7,780. Further, the only ATM withdrawal made from this account during that four-month period was the $200 withdrawal made on December 10, 2017, the receipt for which was seized from the Germantown, MD residence leased in the name of Robert Malkin.

c.      The debit card associated with this account was used in the Los Angeles, CA area, including near Ventura, CA, during the third week in January 2018. The expenditures included probable purchases from Virgin Airlines, hotels, and Avis Rent-A-Car. A $4,000 currency deposit followed these expenses on February 5, 2018. Ventura, CA is the location of

Robert Malkin's residence and business addresses. Ventura is in the metropolitan area of Los Angeles where Jason Malkin, Reys, and Birault also reside.

115.    Records received from Burke & Herbert Bank regarding the checking account for Nahom Hagos reveal the following:

a.    Nearly all deposits into Nahom Hagos' checking account from December 11, 2015 through September 30, 2016 were direct deposits from his listed employer at that time, Global Engineering Solutions.

b.    From October 14, 2016 through March 29, 2018, nearly all deposits into Hagos' checking account consisted of currency or Venmo cash-outs. As per Venmo's website on June 1, 2018, "Venmo is a free digital wallet that lets you make and share payments with friends." The annual totals for the currency deposits were $11,615 in 2016, $31,659 in 2017, and $17,220 through March 29, 2018.

c.    Numerous electronic expenditures were made from Nahom HAGOS' checking account to various retail establishments in the Gaithersburg and Germantown, MD areas, beginning in mid-2016.  Those expenditures were frequently made at fast food establishments while direct deposits were being made to Hagos' account.  Electronic expenditures at fast food restaurants subsided significantly when currency began being deposited into Hagos' account, which indicates that Hagos began making his food purchases with un-deposited currency.

d.    Multiple electronic expenditures were made in the Milwaukee, WI area during December 14-18, 2016, which is when other members of the DTO were in Milwaukee.

116.    A check with the State of Virginia Employment Commission revealed the following:

a.    No wages claimed for Nahom Hagos in any year;

b.    No wages for Seth Jacobs since the 3rd quarter of 2017 with yearly total for 1st three quarters of 2017 being approximately $6000, for 2016 approximately $13,300, for 2015 approximately $12,200, and for 2014 approximately $17,700;

36

c.     No wages claimed for Alae Arbi in any year;

d.     No wages for Mohammed Omar since the 2nd quarter of 2015 with yearly total for 1st two quarters of 2015 being approximately $12,200.

<u>**Travel Information**</u>

117.    The flight, rental car, financial information, and cellular call and location data establish the DTO's known travels in furtherance of the conspiracy to include travel to Los Angeles, San Francisco, Sacramento and Garberville, CA, Milwaukee, WI, MD, and Washington D.C.

118.    The airport in San Francisco is the last major airport in closest proximity to the Garberville/Humboldt County area of northern CA.  In addition, Sacramento, CA is known as a major trucking/shipping location for shipments of marijuana emanating from northern CA.

119.    A review of received subpoenaed airline flight records and rental vehicle records revealed the following:

a.     Habib flew 21 times from the MD area in 2015 and 2016 with 15 flights to San Francisco, 3 to Sacramento, and 3 to Los Angeles. Approximately 7 flights did not have corresponding outbound/inbound flights, most being flights occurring from Baltimore to San Francisco. In 2017, Habib flew 17 times, most departing from Milwaukee with 1 flight to San Francisco, 9 to Sacramento, 3 to Los Angeles, and 4 flights to Washington DC. Two flights did not have corresponding outbound/inbound flights, one flight from Milwaukee to Washington D.C. and one from Los Angeles to Milwaukee.

b.     Approximately 18 of Habib's airfares were paid by Seth Jacobs, including 4 when Habib flew with other individuals and 15 times that Jacobs flew with Habib, all of which occurred in 2015 and 2016.

c.     One of the airfares paid for by Jacobs was for Habib, Arbi, and a third individual, and one of Habib's flights was paid for by Hagos.

37

       d.      Jacobs had 11 flights in 2015/2016 from the MD area with 9 flights to San Francisco and 2 to Los Angeles. Five flights to San Francisco had no located corresponding return flight.

       e.      Omar had one flight in 2016 with Habib from MD to San Francisco.

       f.      Jungwirth had one flight from San Francisco to Los Angeles in 2016 and one flight from Redding, CA to Baltimore in 2017.

       g.      Reys had 14 flights in 2017 with 8 to Washington D.C./Baltimore, 1 to San Francisco, and 5 to Milwaukee/Chicago, all of which occurred between September 2017 and January 2018.

       h.      Robert Malkin had 6 flights in 2016 with 5 to Washington D.C./Baltimore and 1 to Sacramento. In 2017, Malkin had 11 flights, with 3 to Washington D.C./Baltimore, 4 to Milwaukee/Chicago, 1 to San Francisco, and 3 to Sacramento. Most of Malkin's flights originated from the Los Angeles area of Las Vegas and approximately 3 had no corresponding return flights, including 2 in September 2016 when Malkin flew to Baltimore and one in August 2017 when he flew to Milwaukee.

    120.    Rental vehicle records obtained revealed the following:

       a.      Habib had 8 rentals all occurring in 2015, with 4 rented in San Francisco and returned in Alexandria, Virginia, 1 in San Francisco returned in Reno Nevada, 1 in Reno and returned in Washington D.C., and 1 rented and returned in Reno.

       b.      Jacobs had 7 rentals, all in 2016, with 5 rented and returned in San Francisco and 2 rented and returned in Sacramento.

       c.      Reys had 14 in 2017, with 2 in Milwaukee, 10 in Baltimore, and 2 in Chicago all of which were returned to the same city as rented and one rented and returned in 2018

in Baltimore.

      d.    Jason Malkin had 15 in 2017, 7 in Milwaukee with 6 returned in Milwaukee and 1 returned in Pittsburgh, 2 in Pittsburgh that were returned in Baltimore, 1 in Chicago that was returned in Pittsburgh, and 5 rented and returned in Baltimore.  For each rental, Jason Malkin was listed as the renter, and on file for each rental was his driver's license and cellular telephone number ███████, a number law enforcement knowns Jason Malkin to currently use;

      e.    Hagos had 3 in 2016, 1 from Milwaukee, 1 in Washington D.C., and 1 in Sterling, Virginia, all of which were returned to the same cities; in 2018, Hagos also had 1 which was rented and returned in Washington D.C.

      f.    Jungwirth had 1 rental in 2016 in Redding and 2 in 2017 in Baltimore and Sacramento, all returned to the same cities.

      g.    Robert Malkin had 7 in 2016 with 4 in Baltimore/Washington D.C., 1 in Redding, and 2 in Sacramento, all of which were returned to the same cities except 1 from Sacramento returned to Los Angeles; in 2017, Malkin rented 17, 2 in Milwaukee, 6 in Sacramento, and 9 in Baltimore/Washington D.C. All were returned to the same cities except 3 from Sacramento had 2 returns in San Francisco and 1 in Los Angeles; in 2018 Malkin had 3, with 2 in Sacramento and 1 in San Francisco, all returned to the same cities.

121.    On at least eight different occasions between January 2017 and September 2017, Robert Malkin and Jason Malkin incurred expenses for airline flights and/or rented vehicles in Milwaukee.  Some of those rentals coincided with the stash house rental time periods in Milwaukee.  For example, on February 25, 2017, the Jason Malkin card incurred an rental car expense in Milwaukee, WI.  The following day, on February 26, 2017, the Jason Malkin card incurred an expense for Jason Malkin to fly from Los Angeles, CA to Milwaukee, WI.  On

February 28, 2017, the rental application in the name of Robert K. Malkin for the Ravinia Drive

stash house in Greenfield, WI, as well as proof of Robert Malkin's income, were submitted through

BobMalkin@gmail.com.  On March 1, 2017, the Jason Malkin card incurred another rental vehicle

expense in Milwaukee, WI.  Also on March 1, 2017, Habib flew from Milwaukee, WI to

Sacramento, CA, a transportation hub for the shipment of marijuana in northern CA.  Also on

March 1, 2017, Robert Malkin rented a vehicle in Sacramento and returned it one day later, which

coincided with Habib's departure from Sacramento back to Milwaukee.

122.    On numerous other occasions in 2017, Lev Reys, Robert Malkin, Jason Malkin,

and Scott Jungwirth rented vehicles in Baltimore, MD.

123.    It is noted that the airports in Washington D.C. and Baltimore, MD are the same

proximate distance from the stash house in Germantown, MD and the warehouse hangar in

Hagerstown, MD. The CI also advised that the defendants would utilize either airport when they

traveled to MD.

124.    On October 6-8, 2016, expenditures on the Robert Malkin credit card issued to

Jason Malkin were incurred at a hotel in Garberville. It is noted that Habib and Jacobs flew from

Baltimore to Los Angeles on October 7, 2016.

125.    In November 2016, Robert Malkin incurred expenses for a flight in his name from

Los Angeles to Pittsburgh, PA and a rental car in Pittsburgh, which Malkin returned in Miami,

Florida on November 19, 2016. On November 19, 2016, Habib and another individual flew to

Miami and returned on November 19. On November 20, Robert Malkin incurred an expense for a

flight from Miami to Los Angeles.

126.    On December 6, 2016, Robert Malkin flew from the Los Angeles area to

Sacramento and rented a vehicle in Sacramento. On that same date, the credit card in the name

Jason Malkin incurred expenses at a location in Sacramento and one in Redding. On December 6 and 7, the card in the name of Scott Jungwirth incurred expenses in Redding. On December 7, Habib and Jacobs flew from Baltimore to San Francisco, and Jacobs rented a vehicle in San Francisco, which was returned on December 9. On December 8, the card in the name Jason Malkin incurred an expense for a flight in the name Robert Malkin on December 11 and a flight for Jason Malkin from Los Angeles to Pittsburgh but the card continued to incur expenses in northern CA until December 12. On December 9, Habib and Jacobs flew from San Francisco to Washington D.C.

127.    On January 9, 2017, Robert Malkin incurred an expense in Milwaukee and on January 10, the card in the name Jason Malkin incurred expenses for a flight from Los Angeles to Milwaukee and a rental car with a return in Pittsburgh. On January 11, Robert Malkin rented a vehicle in Pittsburgh and then flew from Pittsburgh to Los Angeles.

128.    On other dates in January and February, 2017, the Jason Malkin card incurred expenses on 3 different occasions in Milwaukee. On one occasion, the Jason Malkin card incurred expenses chronologically: first in Milwaukee, then Germantown, MD, then a return in Washington D.C. of a vehicle rented in Milwaukee, and finally, an expense for a flight from Washington D.C. to Los Angeles. On February 3, 2017, Habib flew from Milwaukee to Washington D.C., and one day later, the Jason Malkin card incurred expenses within the following week for a flight from Los Angeles to Milwaukee with another rental vehicle expense.

129.    On July 16, 2017, Robert Malkin rented a vehicle in Washington D.C., which he did not return until July 27, 2017. The Jason Malkin card incurred an expense on July 17, 2017 for a rental car from Milwaukee, with a return date of the same day, July 17, 2017, in Chicago, IL. The following day, July 18, 2017, the Scott Jungwirth card incurred an expense to fly from

41

Redding, CA to Baltimore, MD, while the Jason Malkin card incurred an expense to fly from Baltimore, MD to Los Angeles, CA. This timeline coincides with the July 17, 2017 move-in date for the stash house located in Germantown, MD, which was rented in the name of Robert Malkin. Based on these records, law enforcement believes that Robert Malkin, Jason Malkin, and Scott Jungwirth were present in MD to assist with establishing the Germantown stash house.

130.   A review of a Lev Reys credit card accounts, including Citibank account statements, revealed that Reys flew to Milwaukee from Los Angeles on September 19, 2017, and then from Milwaukee to Baltimore on September 22, 2017. Reys then flew from Baltimore, MD to Los Angeles on September 23, 2017. At the same time, Robert Malkin was also present in Milwaukee. Historical cell-tower information placed Robert Malkin in Milwaukee from September 19-21, 2017. A review of flight records revealed that on September 22, 2017, Robert Malkin traveled from Milwaukee to Baltimore – the same date that Reys flew to Baltimore.

131.   On November 8–9, 2017, Reys' credit card also incurred charges from a Holiday Inn hotel and Home Depot store in the Milwaukee area. Records received from the Holiday Inn revealed Reys rented a room the night of November 8 into November 9, 2017. A review of the transaction receipt from home Depot from November 9, 2017, revealed Reys purchased various household cleaning items and supplies including lockset(s), the same type of air fresheners observed at ███████████████████████████ and latex gloves.

132.   The charge card accounts and airline records show a pattern in 2017 of Robert and Jason Malkin travels overlapping with believed shipments of marijuana from CA to Milwaukee/MD and arrangements with Reys and Habib to establish the stash locations in Milwaukee WI and  Germantown/Hagerstown, MD.

133.   On June 4, 2017, Jacobs and Habib were stopped by the Milwaukee County

Sheriff's Department in a Nissan Maxima, known to be driven by Habib. Jacobs, a rear passenger in the vehicle, was issued a citation for possession of marijuana. The report indicates there were more occupants of the vehicle other than Habib and Jacobs but does not list their names or seating positions. The report stated Jacobs' address was ███████████████████████ and that his address was verified.

134.     Subpoenaed credit card and hotel records revealed Jacobs and Hagos both having incurred charges on credit cards in their names for InterContinental Hotels in Milwaukee with hotel records showing two rooms rented under the name Colin Jacobs (Colin is middle name of Seth C. Jacobs) on December 12, 2016, and a room rented under the name Nahom Hagos for 2 nights, December 12 and 13, 2016.

135.     Omar traveled with Habib to northern CA on July 24,2016; the flights were paid for by Jacobs.

### Telephone Data Analysis

136.     Numerous cellular telephone call records and data have been reviewed and analyzed, which revealed cellular telephone numbers for Robert Malkin, Jason Malkin, Reys, Birault, Jungwirth, Omar, Jacobs, and Hagos.

137.     A review of telephone toll and pen register / trap and trace data from identified telephone numbers has revealed varied volume of contacts between the defendants during 2017 and 2018. Lower call volume is consistent with use of multiple cellphones and use of Telegram app.  Records reveal the following:

138.     Omar ███████████ :

a.       280 contacts with Jacobs ██████████ between 05/31/18 and 6/27/18, 11 contacts with Jacobs ██████████ between 11/18/17 and 11/27/18, and 22 contacts with Jacobs

43

██████████ between 1/11/18 and 1/23/18;

     b.     54 contacts with Reys (██████████) between 11/20/2017 and 11/21/17;

     c.     3 contacts with Arbi (██████████) on 12/28/17; and

     d.     1 contact with Hagos (██████████) on 5/18/18.

139.     Jason Malkin (██████████):

     a.     271 contacts with R. Malkin (██████████) between 4/26/17 and 7/3/17; and

     b.     33 contacts with Reys (██████████) between 11/2/17 and 12/15/17.

140.     Lev Reys (██████████):

     a.     60 contacts with Omar (██████████) between 11/20/17 and 11/21/17;

     b.     1 contact with R. Malkin (██████████) on 9/18/17.

141.     Lev Reys (██████████):

     a.     44 contacts with Birault (██████████) between 8/17/17 and 5/23/18; and

     b.     8 contacts with R. Malkin (██████████) between 8/17/17 and 9/29/17.

142.     R. Malkin (██████████):

     a.     10 contacts with J. Malkin (██████████) between 6/2/18 and 7/3/18; and

     b.     2 contacts with Reys (██████████) on 9/18/17.

143.     Hagos (██████████):

     a.     9 contacts with Omar (██████████) between 4/8/18 and 5/18/18.

144.     Birault (██████████):

     a.     5 contacts with Reys (██████████) between 5/14/18 and 6/13/18.

145.     Reys, Habib, Jacobs and Robert Malkin cellular call and location data revealed that all of their cellphones were near Garberville, CA on November 2, 2017 and on that day, Malkin

44

had telephonic contact with an individual from Garberville who operates a marijuana growing farm.

146. Additionally, review of Robert Malkin's cellular call and location data showed the following:

a.    04/27/2017-04/29/2017 – utilizing cell phone towers near Dulles, VA; Germantown, MD, and Pittsburgh, PA had contact with an individual that has a listed address of █████████████████████ on 04/28/2017.

b.    05/03/2017-05/04/2017 – utilizing cell phone towers near Sacramento, CA and Garberville, CA had contact with Jason MALKIN (██████████) on 05/04/2017. Airline information shows HABIB traveling from Milwaukee, WI to Sacramento, CA on 05/03/2017.

c.    05/21/2017-05/24/2017 – utilizing cell phone towers near Frederick, MD; Pittsburgh, PA; Breezewood, PA, and Washington, DC had contact with number associated with ████████████████████ on 05/22/2017, with Worldwide Freight Company (███████ ████) on 05/23/2017 and 05/24/2017, Trailer Transit Inc. (██████████) on 05/24/2017, and with Scott JUNGWIRTH ██████████) on 05/24/2017.

d.    06/02/2017-06/03/2017 – utilizing cell phone towers near San Francisco, CA, Bakersfield, CA and Garberville, CA had contact with Scott JUNGWIRTH (██████████) on 06/02/2017.

## V.    CONCLUSION

146. Based on the forgoing, I believe there is probable cause to believe that the following individuals have and are committing violations of federal law, including Title 21, United States Code, Sections 841, and 846; and Title 18, United States Code, Sections 1956, and 2. These individuals are: Robert K. Malkin, Seth C. Jacobs, Lev B. Reys, Jason J. Malkin, Mohammed E.

Omar, Alae Arbi, Nahom Hagos, Scott A. Jungwirth, Fredric H. Birault; and, Lachelle Cook (Money Laundering).  I further believe that there is probable to believe that located at and in the property described in Attachment A, there is evidence of money laundering, all of which is detailed more specifically in Attachment B, Items to be Seized.